# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 13-164-6 |
| KHUSEN AKHMEDOV, <br> a/k/a "Hass" | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The defendant in this case, Khusen Akhmedov, was a trained and certified Emergency Medical Technician ("EMT"). He was fully capable of making an honest living in a profession that required knowledge, skill, and, importantly, concern for the welfare of others. But instead of caring for the sick and injured, Akhmedov used his EMT credentials to enable Penn Choice Ambulance Inc. ("Penn Choice") to defraud Medicare and the United States taxpayers. Defendant Akhmedov saw an opportunity to make fast and easy money with Penn Choice and he took it. He and his co-conspirators at Penn Choice essentially provided nothing more than a private taxi service using mechanically unsound and unsafe ambulances to transport ambulatory patients to and from dialysis treatment appointments. Medicare paid Penn Choice more than $400 for each medically unnecessary trip. There is no explanation for Akhmedov's conduct other than that he acted out of self-interest and greed.

For these reasons, as well as for the reasons provided below, the government recommends a sentence of incarceration within the advisory guideline range advocated by the government. The Presentence Investigation ("PSI") report shows an advisory range of 33 to 41 months. In its calculations, the United States Probation Office ('Probation") did not apply a

reduction for acceptance of responsibility due to the defendant's post-indictment conduct. For the reasons stated in section II paragraph B of this memorandum, the government recommends the application of a 3-level reduction for Acceptance of Responsibility and Early Notification pursuant to the stipulations in the guilty plea agreement and to U.S.S.G. §§ 3E1.1(a) and (b). Should the Court accept the government's recommendations, the defendant's guideline range would be 24 to 30 months.

I. **BACKGROUND**

In September 2009, Penn Choice became a Medicare-approved provider for basic life support ambulance transport. Penn Choice targeted ambulatory dialysis patients who required regular transport to and from dialysis three (3) times per week. Medicare paid approximately $400, plus a mileage allowance, for each round trip ambulance transport. As a result, each dialysis patient covered by Medicare could generate approximately $1,200 per week in revenues for Penn Choice. Penn Choice transported these patients and billed Medicare for ambulance services even though the patients had been transported safely by other means.

Akhmedov joined the Penn Choice conspiracy in July 2011. Although he was an EMT, Ahkmedov did not render medical care to patients during his tenure at Penn Choice. Instead, he was an active player in furthering the conspiracy by recruiting ambulatory dialysis patients and by paying illegal kickbacks to induce these patients to be transported by Penn Choice ambulance even though such transport was not medically necessary. Akhmedov was paid a cash bonus for each dialysis patient that he brought to Penn Choice. The more patients he recruited, the more money he made. It appears that Akhmedov viewed patients as commodities whom he could exploit for his personal gain.

The fraud at Penn Choice was so wide-spread and blatant that Akhmedov and his co-conspirators regularly transported one beneficiary who rode in the front passenger seat of the ambulance and smoked cigarettes during his trip. Penn Choice billed Medicare more than $100,000 for this patient's transport. To conceal the true condition of the patients being transported, Akhmedov and his co-conspirators falsified documentation to reflect that patients were bed-confined and required continuous medical monitoring and care during transport, when in fact patients walked to and from the ambulance and no monitoring was performed of any kind.

Akhmedov abruptly left Penn Choice in March 2012 after a dispute with a co-conspirator over money. While Akhmedov's involvement in the conspiracy was relatively short, his departure from Penn Choice did not signal a renouncement of criminal activity. On the contrary, Akhmedov quickly joined Superior EMT Ambulance Company ("Superior") which was also involved in Medicare fraud. On September 24, 2013, Superior and its owners were indicted for Medicare fraud and have recently pleaded guilty. Akhmedov had been recruiting and transporting ambulatory patients for Superior up until his arrest in this case.[1]

On April 9, 2013, a federal grand jury for the Eastern District of Pennsylvania returned a 30-count indictment charging Akhmedov and co-conspirators Anna Mudrova, Yury Gerasyuk, Mikhail Vasserman, Irina Vasserman, Aleksandr Vasserman, Valeriy Davydchik, and Penn Choice with conspiracy to commit health care fraud and related charges. Akhmedov was charged with one (1) count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; 11 counts of false statements in a health care matter, in violation of 18 U.S.C. § 1035; and four (4) counts of violating the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2)(B). From September 2009 through January 2013, Penn Choice caused Medicare to incur losses of more than

---

[1] Akhmedov was not charged in the Superior indictment.

$1.5 million. Approximately $582,665 of the loss was incurred during the period that Akhmedov was involved in the conspiracy.

While on pretrial release, Akhemedov was arrested and charged by the Philadelphia District Attorney with multiple counts of 3rd Degree murder for alleged participation in a drag race resulting in the death of four pedestrians.[2] Prior to this incident, the defendant had participated in an extensive proffer with the government after which he had communicated through counsel his desire to plead guilty. On December 5, 2013, Akhmedov pleaded guilty to all charges in the federal indictment. Sentencing is set for June 5, 2014.

## II. SENTENCING CALCULATION

A. Statutory Maximum Sentence

The maximum sentence for a violation of 18 U.S.C. § 1349 (Count 1- Conspiracy to Commit Health Care Fraud) is 10 years imprisonment, a term of supervised release after imprisonment of three (3) years, a $250,000 fine, and a $100 special assessment.

The maximum sentence for each violation of 18 U.S.C. § 1035 (Counts 6 through 16 – False Statements in a Health Care Matter) is 5 years imprisonment, a 3 year term of supervised release, a $250,000 fine, a $100 special assessment, and mandatory restitution.

The sentence for each violation of 42 U.S.C. § 1320a-7b(b) (Counts 23 through 26 – Anti-Kickback Statute) 5 years imprisonment, a term of supervised release after imprisonment of three (3) years, a $25,000 fine, and a $100 special assessment.

The total maximum sentence is: 85 years imprisonment, fines of $3,100,000[3], three (3) years of supervised release after imprisonment, a $1,600 special assessment. Full

---

[2] Akhmedov was arrested on July 17, 2013, and has remained in custody since.
[3] In the alternative, the Court could order a fine of twice the pecuniary gain to the defendant or twice the pecuniary loss to others. In this case, that would result in a fine of $1,165,300. However, the parties are in agreement that the defendant is unlikely to be able to pay a substantial fine, particularly after being ordered to pay full restitution.

4

restitution, currently estimated at $582,665.87, also must be ordered.

                B.        Sentencing Guidelines Calculation

The PSI calculates an advisory guideline range of 33 to 41 months[4] which does not include a 3-level reduction for acceptance of responsibility (-2) and early notification (-1). The Probation department concluded that the reduction did not apply due to the defendant's post-indictment conduct.[5] On April 10, 2013, Akhmedov was released on $100,000 O/R bond with conditions, including no new arrests. On July 17, 2013, he was arrested and charged by the Philadelphia District Attorney with multiple counts of 3rd Degree murder for alleged participation in a drag race resulting in the death of four pedestrians.[6] Akhmedov remains in custody awaiting trial on these charges. A trial date has not been set.

        Per the guilty plea agreement the parties stipulated to a 2-level downward adjustment for acceptance of responsibility and a 1-level downward adjustment for the defendant's early notification to the government of his intent to plead guilty. This stipulation was based on the defendant's decision to plead guilty and his participation in a proffer with the government shortly after he was indicted on April 9, 2013. During the proffer, Akhmedov provided a detailed account of his criminal conduct and that of his co-conspirators.

---

[4] Based on Offense Level of 20 and Criminal History Category I.
[5] The PSI cites United States v. Ceccarani, 98 F.3d 126 (3rd. Cir. 1996) for the proposition that Akhmedov's post-indictment conduct should preclude the Court from granting a reduction for acceptance of responsibility. In Ceccarani, the defendant tested positive five (5) times for illegal drug use between the entry of his guilty plea and sentencing. Further, he refused to participate in a drug treatment program as recommended. Id. Similarly in other Third Circuit decisions affirming the district court's decision to refuse to apply a reduction for acceptance of responsibility after a guilty plea, the defendant typically demonstrated a pattern of repeated violations, such as multiple positive drug tests, and other planned criminal acts. See United States v. Wallace, 126 Fed. Appx 568 (3rd Cir 2005); United States v. Pletcher, 164 Fed. Appx. 208 (3rd Cir 2005); United States v. Lake, 330 Fed. Appx 377 (3rd Cir 2009). Akhmedov's post indictment conduct, while serious, does not appear to represent the type of repeated contempt for the law reflected in other cases which led the court to conclude that the defendant had not accepted responsibility for his criminal conduct.
[6] On September 11, 2013, Akhmedov pleaded guilty to disorderly conduct related to an incident on July 8, 2013 in Lancaster County.

Akhmedov was charged with the new offenses prior to entering his guilty plea on December 5, 2013. At that time of entering his plea, Akhmedov candidly admitted to the Court his role in the Penn Choice fraud conspiracy and proceeded without hesitation to enter a plea of guilty. Akhmedov demonstrated an unequivocal acceptance of responsibility for the crimes with which he was charged in the federal indictment. It is the government's position that Akhmedov should receive a 3-level downward adjustment, as so stipulated in the plea agreement, pursuant to USSG § 3E1.1(a) and (b) for accepting responsibility for the crimes for which he was charged in this matter.

The Government otherwise accepts the findings of the PSI. If the Court finds that the defendant has accepted responsibility, the resulting advisory guideline range would be 24 to 30 months.

## III. ANALYSIS OF FACTORS PURSUANT TO 18 U.S.C. § 3553

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is one within the advisory guideline range.

The United States Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for

6

the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).[7]

    1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

Akhmedov played an active and important role in Penn Choice's elaborate Medicare fraud scheme.   He recruited ambulatory dialysis patients and delivered kickback payments in order to retain patients for Penn Choice.   By providing Penn Choice with a steady stream of patients the scope of fraud, and its attendant profits, increased rapidly.   As an EMT, Akhmedov falsified documents to conceal the true nature of the patient's condition to disguise the fraud from Medicare.   His EMT credential lent Penn Choice an air of legitimacy which it needed to avoid scrutiny by licensing agencies, patients and Medicare.   Akhmedov went so far as to procure fake Emergency Vehicle Operator and CPR credentials for his co-conspirators who drove Penn Choice ambulances.

---

[7] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"   United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

Akhmedov clearly was capable of making an honest living. Unlike many other criminal defendants, he had a high school diploma, attended college and was a certified EMT. Notwithstanding these advantages, Akhmedov chose to steal funds from taxpayers and put at risk the continued existence of the Medicare system, which is designed to protect the poor and elderly.

Akhmedov is a young man who appears in good physical health. According to the PSI he has never been burdened by mental health problems or substance addiction. By his own account, he was raised in a stable and loving family. Akhmedov is married and has a three year old son, who is being raised and cared for in Russia by his maternal grandmother. There is nothing in the defendant's background or reported history to suggest that he was motivated to commit this crime due to financial pressure or other duress. On the contrary, his family has provided him with considerable support. One can only conclude that the defendant merely dislikes honest work and is unable to avoid the lure of easy money obtained by breaking the law.

Accordingly, the nature and circumstances of the offense and the defendant's history and characteristics argue in favor of the imposition of a sentence within the advisory guidelines.

2. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.

Health care fraud, like that committed by the defendant, is a serious offense that can have significant implications for the nation. According to the Federal Bureau of Investigations, health care fraud is a rising threat to the country, costing the United States $80 billion a year.[8]

---

8 See Health Care Fraud, http://www.fbi.gov/about-us/investigate/white_collar/health-care-fraud.

Not only does health care fraud like that committed by the defendant jeopardize the system, but significant resources must be spent by federal investigators to identify, pursue, and stop this type of fraud. A 2006 report from The Department of Health and Human Services, Office of the Inspector General indicates that in 2002, Medicare spent almost $3 billion for ambulance transports and that previous studies have identified this benefit as being "highly vulnerable to abuse."[9] The Philadelphia region in particular has experienced a significant rise in the number of unscrupulous ambulance transport providers who are defrauding the Medicare system. In an attempt to stem the proliferation of this type of fraud, the Centers for Medicare Services announced on January 30, 2014 that it would impose a moratorium on Medicare enrollment for ambulance suppliers in Philadelphia.

It is clear that the recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2). In order to promote respect for the law, which is one of the most important sentencing principles set by Congress, the sentence imposed in this case should send a resounding message that those who commit fraud by taking advantage of vulnerable victims will not be tolerated. See United States v. Gall, 552 U.S. 38, 54 (2007) (recognizing "[t]he Government's legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law . . ."). In a House Committee Report on one of the competing bills that led to passage of the 1994 Crime Bill, which was codified as Title 18, United States Code, Section 3553, the House Judiciary Committee provided: "[This] [p]aragraph . . . provides that a criminal sentence must not cause disrespect for the law. This purpose is avoided when

---

[9] http://oig.hhs.gov/oei/reports/oei-05-02-00590.pdf.

9

excessively lenient sentences are avoided." H. Rep. 98-1017, 98th Cong. 2d Sess., Judiciary Committee Report on Sentencing Revision Act of 1984, at 39.

Where a defendant has created an appearance that the laws can be circumvented, it is even more important that serious consequences are imposed to demonstrate to others the importance of following these laws.

A sentence within the guideline range will adequately reflect the seriousness of the offense and promote respect for the law. The defendant has pleaded guilty and understands that he must suffer the consequences of his actions. Those consequences would include a prison sentence in addition to restitution and forfeiture.

3. The Need for Deterrence to Criminal Conduct and to Protect the Public from Future Harms.

When passing the Sentencing Reform Act, Congress explained:

> [It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures ... and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75. As numerous courts have recognized, the Guidelines serve a particularly important purpose in the area of white-collar crime. For instance, the Supreme Court in <u>Mistretta v. United States</u>, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave

specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals." Accord United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes...."); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses"). In United States v. Martin, the Court of Appeals for the Eleventh Circuit provided the following explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as "particularly important in the area of white collar crime." S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, "[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." Id.

455 F.3d 1227, 1240 (11th Cir. 2006).

A guideline sentence in this case for a participant in an ambulance fraud scheme, that included not only false billing of Medicare, but also creating an elaborate trail of false documents, will send a critically important message of deterrence, i.e., that the punishment will be so severe that it is not worth committing the crime, regardless of the significant financial benefits. See, e.g., Stephanos Bibas, White-Collar Plea Bargaining & Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005) ("[W]hite-collar crime is more rational, cool, and calculated than sudden crimes of passion or opportunity, so it should be a prime candidate for general deterrence. An economist would argue that if one increased the expected cost of white-collar crime by raising the expected penalty, white-collar crime would be unprofitable and would thus cease."); Martin, 455 F.3d at 1240 ("Defendants in white collar crimes often

calculate the financial gain and risk of loss, and white collar crimes therefore can be affected and reduced with serious punishment.").

This is a case in which deterrence is one of the most important of the Section 3553(a) factors. Health care fraud not only harms insurers, patients, and governmental programs, it also jeopardizes the effectiveness of the health care system and the ability of the system to provide care to those who need it. Physicians, care providers, and providers of health care benefits are in a position of trust. There are thousands of ambulance companies throughout Pennsylvania who bill for their services. Medicare and private payers place their trust in these providers that the bills are truthful and that the services being paid for are actually needed. The sentence imposed in this case should take into account the crucial importance of the message that it will deliver to the countless ambulance companies throughout Pennsylvania, and the country, that their honesty and integrity is of utmost importance. It should also send a clear message to anyone else who would try to operate or assist a fraudulent ambulance business that such conduct will not be condoned by this Court.

The fact remains that the federal government and the states simply do not have the resources to investigate every ambulance company, or to perform audits regarding every Medicare beneficiary being transported by ambulance, to ensure that the ambulance services are actually necessary. The government cannot be in those ambulances on a daily basis to ensure that beneficiaries actually need those services. We rely, as we must, on the integrity of the ambulance providers who enrolled in the Medicare system, the health care professionals who are attendants on those ambulances, and others who work in the health care field, as well as upon the medical records that they create, the certifications they make, and the bills they send to Medicare and insurers, that everything is truthful and accurate and that the services are actually medically

necessary.

This case clearly illustrates the point. With his EMT credentials, Akhmedov helped Penn Choice maintain the illusion of providing legitimate ambulance transport services. He created fraudulent documents to conceal the true condition of patients so that Penn Choice could hide their criminal conduct in the event of an audit by the government. And after departing from Penn Choice, Akhmedov had a ready opportunity available at another unscrupulous ambulance company that was also bilking Medicare.

The sentence in this case must, therefore, be sufficiently severe to deter health care fraud by other ambulance service providers, hopefully sending a message to others to cease their fraudulent conduct and to come forward and repay the government for their fraudulent gains.

4. The Need for Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). He has a high school diploma and attended college. He is capable of maintaining honest employment if he so chooses. Therefore, educational and vocational training is not an issue.

5. The Guidelines and Policy Statements Issued by the Sentencing Commission.

The Guidelines remain of significant importance in advising judges regarding appropriate sentences. Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible. The best vehicle for achieving such a goal is through

application of the Sentencing Guidelines.  Here, the defendant was engaged in a wide-spread pattern of health care fraud, which involved the falsification of the patients' records to conceal the fraud.  Only application of the Guidelines assures that the defendants will be treated in the same manner as others who commit similar fraud against a system that is designed to ensure that there is appropriate care available for some of the most vulnerable members of our society—the elderly, the infirm, and the poor.

      6.      The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Crimes.

There have been numerous cases in the Eastern District of Pennsylvania involving the sentencing of individuals involved in ambulance fraud schemes, highlighting the need for general deterrence in this area.  In these cases, the defendants were sentenced within, or very close to, the guideline range.  For example, in May 2013, Judge Padova sentenced defendant William Hlushmanuk to 92 months in prison, which was within the calculated guideline range of 84 to 105 months, for his role in a health care fraud scheme that involved approximately $5.4 million in fraudulent billing to Medicare for ambulance services that were not medically necessary.  Cr. No. 12-327 (E.D. Pa. May 16, 2013).  In September 2013, Judge Schiller sentenced brothers Aleksandr Zagorodny and Sergey Zagorodny to 78 months and 60 months in prison respectively for their roles in a health care fraud scheme that involved approximately $3.5 million in fraudulent billing to Medicare for ambulance services that were not medically necessary.  Cr. No. 12-381 (E.D. Pa. September 10, 2013).  Judge Schiller was persuaded to vary somewhat from the guideline range of 97 to 121 months because of extenuating family issues.  In addition, Judge Schiller found that Sergey Zagorodny suffered from a significant health condition which persuaded him to grant a more significant variance, or 37 months from

the low end of the range. However, nothing in the present case suggests that such a variance would be appropriate.

In other health care fraud cases, the Third Circuit upheld as reasonable sentences imposed by the district court that were within, or very close to, the advisory guideline range. See United States v. Morris, 464 Fed. Appx. 84 (3d Cir. 2012) (defendant sentenced to 33 months after pleading guilty to health care fraud with an advisory guideline range calculated at 27-33 months.); United States v. Aromowitz, 151 Fed Appx. 193 (3d Cir. 2005) (dentist billing for services not performed, sentenced to 48 months within guideline range of 41-51 months.). Accordingly, a sentence within the advisory guideline range will ensure an appropriate and consistently applied level of punishment.

7. The Need to Provide Restitution to Any Victims of the Offense

"As its name suggests, the Mandatory Victims Restitution Act, which was enacted by Congress in 1996, mandates that defendants who are convicted of or plead guilty to certain crimes pay restitution to their victims." United States v. Quillen, 335 F.3d 219, 222 (3d Cir. 2003) (quoting United States v. Simmonds, 235 F.3d 826, 830 (3d Cir. 2000)). With respect to restitution, the government has estimated that the appropriate amount of restitution is $582,665.87, consisting of fraudulent claims paid to Penn Choice by Medicare during the defendant's involvement in the conspiracy which is from July 2011 through March 2012. The government has provided this calculation to defense counsel, and to probation.

IV. **CONCLUSION**

For the reasons stated above, the government respectfully recommends a within-guideline sentence, to include an order of full restitution to Medicare and a money

judgment to forfeit any proceeds traceable to the offense. Such a sentence is essential to punish defendant for his crimes to assure respect for the law, and to deter others from embarking on this type of fraud scheme.

        Respectfully submitted,

        ZANE DAVID MEMEGER
        United States Attorney


        /s/ M. Beth Leahy
        M. BETH LEAHY
        Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that this pleading was electronically filed, and was thus served on this date upon defense counsel:

Todd Henry, Esq.
1500 Walnut Street
22nd Floor
Philadelphia, PA 19102
Counsel for Khusen Akhmedov

/s/ M. Beth Leahy
M. BETH LEAHY
Assistant United States Attorney

Dated:   May 23, 2014.